UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG - 6 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

---

TONYA KAY DAY *aka* TONYA KAY
FOELGNER
(individually); and
TONYA KAY DAY
(as trustee and administrator for LAVERA
JEAN FOELGNER)

    Plaintiffs

v.

THE CORNER BANK (OVERSEAS)
LTD; CORNER BANK S.A., *aka*
CORNER BANCA S.A.; *aka* GRUPPO
CORNER, *aka* CORNER BANQUE S.A.;
COLYN ROBERTS;
GRAHAM THOMPSON & CO.

and DOES from 1 to 100

    Defendants

Case: 1:10-cv-01339
CI   Assigned To : Roberts, Richard W.
Assign. Date : 8/6/2010
Description: Contract

**VERIFIED COMPLAINT**

**FOR DAMAGES AND ORDERS
BASED ON:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF FIDUCIARY
   DUTIES;**
3. **CONVERSION;**
4. **UNJUST ENRICHMENT;**
5. **DECLARATORY RELIEF;**
6. **ACCOUNTING;**
7. **CIVIL CONSPIRACY;**
8. **BATTERY;**
9. **INFLICTING SEVERE
   EMOTIONAL DISTRESS;**
10. **MALPRACTICE;**
11. **MISREPRESENTATION,
    FRAUD**

---

    This is an action for recovery of the moneys owned by Plaintiffs on the account

held, or controlled, by Defendants.

## I. PARTIES

    1.    Plaintiff TONYA KAY DAY, *aka* TONYA KAY FOELGNER, her

maiden name (hereinafter also "DAY"), acting individually, is a U.S. citizen, currently

residing in Las Vegas, Nevada.  She is, on information and belief, the beneficiary of the

assets on the account held or controlled by Defendants (the "Account").  DAY has trust

arrangements in Washington, D.C.

2.     Plaintiff TONYA KAY DAY is also a trustee and an administrator for the certain account's assets of LAVERA JEAN FOELGNER, her mother.  That latter had resided in the State of Kansas before she died in September of 2006.  In that capacity of a trustee and an administrator, DAY, on information and belief, is also the beneficiary of the assets on the Account held by Defendants.  Said trust is governed by the laws of the District of Columbia.

3.     Defendant CORNER BANK (OVERSEAS) LTD. is a subsidiary in the Bahamas of the Swiss bank CORNER BANK, see Paragraph 4 below.  Said banking subsidiary, believed to be a wholly owned subsidiary of the Swiss bank, is located at 308 East Bay Street, Nassau, Bahamas.

4.     Defendant THE CORNER BANK, *aka* CORNER BANK, *aka* CORNER BANK S.A., *aka* CORNER BANCA S.A., *aka* GRUPPO CORNER, *aka* CORNER BANQUE, is a bank with main offices at Via Canova 16, Lugano, Switzerland.  That bank was founded in 1952 and has since developed offices in Zurich, Lausanne and elsewhere in Switzerland.  It also has developed a subsidiary in the Bahamas, cited in Paragraph 3, as well as it has a subsidiary in Luxembourg.   The bank is known also under the same name in Italian and French languages, as mentioned above, representing the same banking institution in Switzerland.  For purposes of this complaint, the bank, both its parent and its subsidiary in the Bahamas are referred to hereinafter as "CORNER BANK".

5.     Defendant COLYN ROBERTS (hereinafter also "ROBERTS") is an individual, on information and belief, a manager of CORNER BANK in Nassau, the Bahamas, cited above.

2

6.      Defendant GRAHAM, THOMPSON and Co. (hereinafter "GRAHAM THOMPSON") is a law firm in the Bahamas, situated at the address: Sassoon House, Shirley St & Victoria Ave., P.O. Box N-272, Nassau, the Bahamas.  Plaintiffs retained said law firm that did not disclose that it actually represented the adverse party in the same matter, CORNER BANK.

## II. JURISDICTION

7.      This Court has jurisdiction pursuant to 28 U.S.C. Section 1332, because of the diversity of jurisdiction of the parties.  Namely, DAY, acting individually, is a citizen of the State of Nevada.  In her capacity as a trustee for her deceased mother FOELGNER, DAY has substantial nexus to the State of Kansas.  In her both capacities, DAY has trust arrangements in, and under the laws of, the District of Columbia.  None of the Defendants are citizens of any of these three jurisdictions in the U.S.

8.      Specifically, CORNER BANK (OVERSEAS) LTD. and ROBERTS are residents of the Bahamas.  Likewise, GRAHAM THOMPSON is a law firm in the Bahamas.  The parent Swiss bank, THE CORNER BANK, *aka* CORNER BANK S.A. *aka* CORNER BANCA S.A., *aka* GRUPPO CORNER, *aka* CORNER BANQUE S.A., is a bank, situated in, and governed by the laws of, Switzerland, more specifically, Canton Ticino.

9.      Jurisdiction is proper, because the amount of controversy, over $14 million, is in excess of the statutory minimum of $75,000.  The amount in controversy is thus in excess of the statutory minimum under 28 U.S.C. Section 1332.

10.     Venue is proper, because Plaintiffs have made trust arrangements in Washington D.C.  It is also proper because of the presence of the Embassy of the Bahamas in Washington, D.C., that may be involved in the transfer of the documents and

3

for other reasons. Likewise, venue is proper, because the Embassy of Switzerland in
Washington, D.C. has an office of commercial attaché and an office of a legal attaché,
who may be involved in this litigation for the transfer of the required documents and for
other reasons.

### III. UNDERLYING FACTS

11.     As mentioned above, DAY was the daughter of the deceased,
FOELGNER. DAY and FOELGNER had a very close relationship until FOELGNER
passed away, as addressed below.

12.     During her lifetime, FOELGNER accumulated substantial savings,
earnings and had independent wealth from the family, ultimately amounting, in the
aggregate, to at least $14 million, in part pursuant to revenues from participation for
many years in the oil business.

13.     On information and belief, at some point FOELGNER opened a joint
account or a trust account with CORNER BANK (OVERSEAS) LTD. in the Bahamas.
FOELGNER and DAY were the holders or alternatively beneficiaries of that account (the
"Account").

14.     On information and belief, FOELGNER traveled to the Bahamas on many
occasions and at least once a year for a certain period of time.

15.     FOELGNER and DAY had various conversations, in which FOELGNER
conveyed that she had set aside certain savings on an Account in Nassau, the Bahamas,
and wanted, after her death, that DAY and DAY's daughter (thus FOELGNER's
granddaughter), as well as the latter's children to benefit from, and inherit, the proceeds
on that Account in Nassau.

16.     More specifically, such a conversation took place on or about July 3, 2006, when DAY was visiting FOELGNER in Kansas and stayed at her place for about two days.  That visit, as always before, was marked by a usual mother-daughter special attachment to each other.

17.     During that particular stay of her daughter at her home, FOELGNER conveyed to DAY the information about the Account, showing the Account's number on a painting.  FOELGNER orally repeatedly named that bank, CORNER BANK, saying that at least $14 million had accumulated on that Account at that bank.  Based on the oral conversation, to the best of DAY's understanding, the Account was in joint names of FOELGNER and DAY, or alternatively, it was a trust Account with two beneficiaries, FOELGNER and DAY.

18.     At that meeting, FOELGNER specifically pointed DAY's attention to that painting that was either related to, or bought, during one of her trips to the Bahamas.  There was a sticker on the back of that painting with the mechanically printed numbers of the Account number and one of two passwords.  FOELGNER referred to that painting before DAY, with the express intention that DAY and her assigns had the rights to use all the proceeds on that Account.  DAY was under the impression that FOELGNER was under belief that she would not live much longer, despite that, at that particular time, her mother seemed to be in good health.

19.     FOELGNER also said that she was to send the bank statements with all information to DAY later on, so that DAY could have her independent access to that Account in Nassau.

20.     Most sadly, on September 8, 2006, FOELGNER was tragically killed, being a victim in a vehicular homicide accident, caused by a drunken driver.  By way of

precaution, Plaintiffs emphasize herewith that no allegations against Defendants are made with regard to that tragic accident.  Simply said, there was no association with the issue of the Account, and the vehicular homicide was completely accidental.

21.     Prior to that tragic accident, FOELGNER, therefore, did not pass the banking statements to DAY.  Thus, DAY was left with the information that remains on the above paper sticker on the painting, as well as the information that FOELGNER passed to DAY orally.  After that accident, DAY also received that painting, through the advice of her aunt (FOELGNER's sister) who said that this is that same painting that the deceased wanted her to have.

22.     DAY, who had, as cited above, a close attachment to her mother, was recovering from her mother's tragic and sudden death for a long time.  Thereupon, DAY started to make inquiries in Nassau, the Bahamas, on that Account.

23.     Among other things, she contacted the Central Bank of the Bahamas, made inquiries about the procedure to recover her Account, characterizing it as a dormant, with limited information available to her.  Ultimately DAY located the office of CORNER BANK in Nassau (among over 100 other banks licensed and operating in the Bahamas).

24.     DAY retained an attorney in the State of Utah, who got in touch with a law firm located in Nassau, Bahamas, GRAHAM THOMPSON.  Said law firm did not disclose, however, at that time that it simultaneously represented CORNER BANK.

25.     At some point, it turned out, however, that GRAHAM THOMPSON in fact simultaneously represented CORNER BANK and knowingly overcame that conflict of interest.  However, at that point, GRAHAM THOMPSON was privy to confidential information from DAY.

6

26.     Once GRAHAM THOMPSON admitted the conflict, in August of 2008 that recovery matter was transferred to another law firm in Nassau, called McKinney, Bancroft & Hughes, at Mareva House, 4 George Street, Nassau, the Bahamas. GRAHAM THOMPSON also passed the retainer money to that other law firm. The motives of GRAHAM THOMPSON not to disclosing that CORNER BANK was its client remain unknown to DAY.

27.     In about June of 2010, DAY traveled to Nassau, the Bahamas, and attempted to visit the office of CORNER BANK at 308 East Bay Street, Nassau. That visit was proceeding under strange circumstances, because the bank's office was not open to the public and the bank manager was not opening the door of the office before DAY, when she asked to enter.

28.     When DAY started the oral communication with the bank's manager, subsequently identified as ROBERTS, he held the door only half-open. DAY told ROBERTS that she wanted to inquire about the Account at issue and that she used the services of GRAHAM THOMPSON. At the course of his other contacts with DAY, ROBERTS said that GRAHAM THOMPSON was a reputable law firm that actually represented his bank, thus which represented both sides in the same matter at some point.

29.     When DAY attempted, again, to enter the bank office and to pass the documents, ROBERTS, on the contrary, attempted to shut the door close, with force, pushing her out. In light of such a conduct, resisting, DAY attempted to hold her foot in the door, preventing the door from being closed. The remainder of the conversation was essentially that ROBERTS would not cooperate and he continued pushing DAY out. DAY told ROBERTS at the end of such an encounter that she had no choice but to initiate litigation against him and his bank.

30.     As a result of such an encounter, DAY suffered not only the physical inconvenience of being pushed out, but also a severe emotional distress after ROBERTS's such outrageous conduct.  DAY was under the impression at that time that she was mocked and that her money was being stolen from her and was under stress of these developments.

31.     DAY further called ROBERTS on the phone several times, but each time ROBERTS refused to cooperate.

32.     As cited above, after GRAHAM THOMPSON actually admitted to DAY that their law firm represented CORNER BANK and transferred the fees received from DAY to another law firm.  That other law firm that replaced it in the Bahamas was, however, of little help to DAY, too.

33.     In the course of those contacts, however, GRAHAM THOMPSON conveyed to DAY at one point that their law firm had the information about the Account but would not release that information to DAY.

34.     DAY also attempted to make inquiries at the main offices of CORNER BANCA in Lugano, Switzerland, also to no avail, as though the parent banking corporation had no control over its subsidiary in Nassau.  On information and belief, CORNER BANCA, however, has the full authority to compel its subsidiary in Nassau, the Bahamas, and the pretense of no access was false.

35.     The net result of DAY's attempted contacts with both CORNER BANK's branch in Nassau and with its parent in Switzerland was that they refused to cooperate with her, even though obligated to cooperate with the person who was, at a minimum, a beneficiary of one of their accounts.

36.    The conduct of CORNER BANK in Nassau in the Bahamas and of ROBERTS was offensive and unbecoming of a banking institution that had fiduciary obligations before persons who have beneficiary rights in accounts held by their bank.

37.    Furthermore, the conduct of CORNER BANK in Nassau was contrary to the laws of the Bahamas, as cited below.

38.    By way of a context, after DAY was treated by CORNER BANK in that outrageous manner, DAY started to review public information about CORNER BANK and found out that there were publications on that bank's bad reputation, alleged money laundering and harboring Iranian accounts, overcoming the sanctions against Iran of the United States.

39.    These publications strengthened DAY's desire and her determination to have the proceeds from that Account transferred under her control to a bank in the United States without any further delays, and to seek any and all damages allowed by the law.

## COUNT I.  (BREACH OF CONTRACT)

### (Against All Defendants)

40.    Plaintiffs incorporate by reference the allegations in the preceding Paragraphs 1 to 39, as if pled with the same force and effect herewith.

41.    As cited above, CORNER BANK, on information and belief, has maintained and held the assets beneficially owned by DAY, both in her individual capacity, and as a trustee and an administrator for FOELGNER's assets on that Account, which she specifically transferred to DAY, along with two passwords.

42.    On information and belief, DAY is the joint account holder with her deceased mother FOELGNER.  CORNER BANK had the obligations under the Account

contract concluded with FOELGNER not to handicap her or DAY's access to that joint or trust Account.

43.    By way of preventing DAY from using the Account and concealing the respective banking records, CORNER BANK was in breach of contract, discarding both express and implied obligations of a bank before its customer and beneficial owner of certain assets.

44.    That conduct was also illegal.  CORNER BANK also disregarded, among other, the law of the Bahamas, namely Section 17 of the Banks Act of the Bahamas, entitled 'Deposits to credit of deceased persons, how dealt with':

> "17.(1)  Notwithstanding the provisions of any Act or law to the contrary, the manager or assistant manager of a bank may, without the production of probate or letters of administration, pay any sum not exceeding four hundred dollars standing to the credit of a deceased person to any person (in this section referred to as the claimant) who upon producing satisfactory proof of the death of such deceased person and upon producing such evidence as may be required by the manager or assistant manager, appears to such manager or assistant manager to be entitled by law to the said sum standing to the credit of such deceased person…"

45.    DAY is entitled to enforce the contract and her entitlement to that money and to obtain the proceeds on that Account, transferring those to the United States.  DAY is further entitled to damages for CORNER BANK's breach of contract.

46.    Likewise, GRAHAM THOMPSON was in breach of the retainer contract, when that law firm in Nassau purported to represent the parties with the adverse interests, without even disclosing that conflict to DAY, until that conflict was incidentally revealed by ROBERTS.

//

//

//

## COUNT II (BREACH OF FIDUCIARY DUTIES)

### (against All Defendants)

47.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 46, as if pled with the same force and effect herewith.

48.     As a bank that obtained proceeds from FOELGNER for the benefit of FOELGNER and DAY, CORNER BANK owed fiduciary duties to both FOELGNER and DAY, as the beneficiaries of these proceeds. CORNER BANK was never an owner of these proceeds and had no right to withhold these proceeds from DAY. However, CORNER BANK ended acting as if the monies belonged to it.

49.     Consequently, CORNER BANK is in breach of its fiduciary duties to DAY. As its officer, ROBERTS, whose conduct was outrageous, also was in breach of his fiduciary duties before the bank's client.

50.     Likewise, GRAHAM THOMPSON was in breach of its fiduciary duties to Plaintiffs, because it represented the parties with directly adverse parties. GRAHAM THOMPSON's subsequent recusal provided no excuse for that law firm's seeking being retained and then being retained by DAY, representing her in the matter against its client CORNER BANK.

51.     Therefore, Plaintiffs are entitled to damages for CORNER BANK's, ROBERTS's and GRAHAM THOMPSON's breach of fiduciary duties before DAY.

## COUNT III (CONVERSION)

### (against CORNER BANK)

52.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 51, as if pled with the same force and effect herewith.

53.     By way of its conduct, CORNER BANK withheld very substantial proceeds, on information and belief, at least $14 million belonging to DAY as the Account holder or its beneficiary.  Those proceeds were very substantial on that bank's books, given the public information about the relatively modest size of that bank and of its branch in Nassau.

54.     By way of its conduct, CORNER BANK attempted to control and it effectively converted the proceeds belonging to the client, without any apparent intent to return the proceeds to whom those belong.

55.     Therefore, Plaintiffs are entitled to damages based on the conversion by CORNER BANK.  That includes both the full restitution of the proceeds and the damages on the basis of conversion and depriving DAY from using those proceeds, i.e. disallowing her to wire transfer those proceeds to the U.S.

## COUNT IV (UNJUST ENRICHMENT)

### (against CORNER BANK)

56.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 55, as if pled with the same force and effect herewith.

57.     By way of obstructing DAY's access to the joint Account, CORNER BANK continued to hold the proceeds, eventually without any intention to provide those to DAY at all.

58.     Regardless of its intent, CORNER BANK has been able to use the proceeds for its own purposes, at DAY's expense, thus being unjustly enriched.  On information and belief, CORNER BANK has been able to use these proceeds, under the circumstances, as its free working capital, and get enriched at least in that manner.

59.     Therefore, Plaintiffs are entitled to damages based on the unjust enrichment of CORNER BANK.

## COUNT V (DECLARATORY RELIEF)

### (Against All Defendants)

60.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 59, as if pled with the same force and effect herewith.

61.     At all relevant times, CORNER BANK denied DAY's entitlement to dispose of the Account and denied her right to be recognized as the Account holder.

62.     Therefore, DAY is entitled to the declaratory relief of this Court, establishing that she is the Account holder and the beneficiary, in her both capacities, individually and as the trustee and the administrator for FOELGNER's interest in that joint Account.

63.     Furthermore, DAY is entitled to a declaratory relief, a judicial declaration that CORNER BANK's and ROBERTS's conduct was unlawful, despicable and outrageous.  Additionally, DAY is entitled to a pronouncement that GRAHAM THOMPSON overcame conflict of interest and breached their professional duties to DAY.

64.     Therefore, DAY is entitled to such declaratory relief, as described above.

## COUNT VI (ACCOUNTING)

### (against CORNER BANK and ROBERTS)

65.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 64, as if pled with the same force and effect herewith.

66.     By way of being a banking institution, CORNER BANK owed the duty of accounting before DAY for the Account, all interest and dividends accrued, any disbursements, along with monthly statements, reflecting all transactions.

67.     CORNER BANK did nothing to comply with its duty to account to the account holder and/or beneficiary, DAY.

68.     Therefore, DAY is entitled to CORNER BANK's and ROBERTS's accounting for all proceeds on the Account, all interest and dividends accrued, or disbursements made, and to provide to DAY all the monthly statements, as well as any other records associated with that Account.

## COUNT VII.  (Civil Conspiracy)

### (against All Defendants)

69.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 55, as if pled with the same force and effect herewith.

70.     As the facts above show, CORNER BANK, ROBERTS and GRAHAM THOMPSON engaged in a civil conspiracy contrary to the interests of DAY, conspiring that she would never get access to that Account and to the proceeds.

71.     CORNER BANK's counsel GRAHAM THOMPSON failed or refused to disclose to DAY that it represented that bank and could not be retained by DAY.  Instead, CORNER BANK, its manager ROBERTS, acted in concert with GRAHAM THOMPSON to impinge upon the interests of DAY and not to allow her access to the Account.

72.     Plaintiffs are entitled to the damages for Defendants' civil conspiracy against DAY.

//

## COUNT VIII.  (Battery)

## (against ROBERTS and CORNER BANK)

73.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 6 and 27-30, as if pled with the same force and effect herewith.

74.     ROBERTS's conduct before DAY, when she tried to visit CORNER BANK's office in Nassau, was outrageous.  ROBERTS's effectively pushing DAY out of the offices of CORNER BANK, using the office's door, was unauthorized, against her will, unbecoming of a banker and outrageous.

75.     DAY was physically overwhelmed by such an extraordinary conduct of a purported banker of CORNER BANK, who used force pushing a woman out of the bank's office, using the door.   That conduct was intentional and tortious.

76.     Plaintiff DAY is entitled to damages against ROBERTS and his *respondeat superior* CORNER BANK, for the tort of battery with malicious intent.

## COUNT IX.  (Inflicting Severe Emotional Distress)

## (against ROBERTS)

77.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 6 and 27-30, as if pled with the same force and effect herewith.

78.     ROBERTS's conduct before DAY was outrageous to cause humiliation of a person traveling all the way from the U.S. to visit CORNER BANK's office. ROBERTS caused DAY's severe emotional distress.  In particular, that stress was caused by ROBERTS's effectively pushing DAY out of the offices of CORNER BANK, using the office's door.

79.     DAY, a weaker woman, was physically overwhelmed by a man, ROBERTS, and distressed by such an extraordinary conduct of a purported banker.  That

15

emotional distress went beyond the fear of the economic loss of over $14 million, but was caused by ROBERTS's using force against DAY. DAY felt distressed and even unsafe for the remainder of her trip to Nassau.

80.     Plaintiff DAY is entitled to damages for ROBERTS's causing a severe emotional distress by his extraordinary conduct including using force, unbecoming of a banker with regard to a woman of less physical power.

### COUNT X. (Malpractice)

### (against GRAHAM THOMPSON)

81.     Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 6 and 24 to33, as if pled with the same force and effect herewith.

82.     When GRAHAM THOMPSON proposed to be retained, and was in fact retained by DAY, said law firm did not disclose that it represented the adverse party, CORNER BANK, thus overcoming and concealing conflict of interest.

83.     That conduct was in violation of the Bahamas Bar Act of 1971 (Chapter 64 of the Bahamas laws, 'Legal Profession'), with the effect in the United States, where DAY was deprived of honest services and of undivided loyalty of a counsel that she retained overseas.

84.     But for an incidental discovering a conflict, DAY would have been unaware that GRAHAM THOMPSON acted in breach of that firm's duties of a counsel before the client.

85.     Therefore, DAY is entitled to damages against GRAHAM THOMPSON for malpractice.

//

//

## COUNT XI. (Misrepresentation, Fraud)

### (against GRAHAM THOMPSON)

86.    Plaintiffs incorporate by reference the allegations in the proceeding Paragraphs 1 to 6 and 24 to 33, as if pled with the same force and effect herewith.

87.    When GRAHAM THOMPSON agreed to be retained and was actually retained by DAY, said law firm concealed that it had been representing the adverse party, CORNER BANK.

88.    Apart from the violation of the Bahamas Bar Act of 1971, such a conduct amounted also to misrepresentation (concealment) and fraud, regardless of the standards of professional conduct and formal duties.

89.    Therefore, DAY is entitled to damages against GRAHAM THOMPSON for misrepresentation and fraud.


## REQUEST FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

a.  Recovery of the above Account and all the proceeds on that Account, in favor of Plaintiffs;

b.  Recovery of any and all interest and any dividends accrued on that Account;

c.  Order to CORNER BANK to immediately transfer all the proceeds deposited on that Account, including all interest, accrual, dividends and the like, to account(s) in the USA, to be designated by DAY;

d.  Order to CORNER BANK to immediately disclose all the banking records on the above Account for the benefit of Plaintiffs;

e.  Punitive and exemplary damages for the despicable conduct of Defendants;

f.   Damages against GRAHAM THOMPSON for malpractice, misrepresentation and fraud, regardless their return of unauthorized fees;

g.   Separate damages against ROBERTS for his despicable conduct *ultra vires*;

h.   Attorney's fees, costs;

i.   Any other relief that the Court finds just and fair.



Respectfully submitted,

Dated: August 2, 2010

/s/

GEORGE LAMBERT (D.C. Bar No. 979327)
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com
Attorneys for Plaintiffs TONYA KAY DAY
(individually) and TONYA KAY DAY (as trustee and
administrator for LAVERA JEAN FOELGNER)

# **VERIFICATION**

I, TONYA KAY DAY, depose and declare under the penalty of perji ry under the

laws of the United States that the foregoing complaint is true and correct.

Dated: August ..., 2010

_Tonya Kay Day_
Tonya Kay Day

18

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial in this action.

Dated: August 2, 2010

/s/

GEORGE LAMBERT (D.C. Bar No. 979327)
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com
Attorneys for Plaintiffs TONYA KAY DAY
(individually) and TONYA KAY DAY (as trustee and
administrator for LAVERA JEAN FOELGNER)

20